**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

<strong>FILED</strong><br>
<strong>UNITED STATES DISTRICT COURT</strong><br>
<strong>DENVER, COLORADO</strong><br>
05/07/2021<br>
<strong>JEFFREY P. COLWELL, CLERK</strong>

DAVID PEREZ

      Plaintiff,

v.

DENVER FIRE DEPARTMENT
CITY AND COUNTY OF DENVER

      Defendant,

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, David Perez, on behalf of himself, herby brings this Complaint against the Denver Fire Department "DFD" and the City and County of Denver all referred to collectively herein as "the City".

**INTRODUCTION**

1. Mr. Perez was a dedicated Firefighter with the DFD for 14 years, a highly decorated Marine with over 15 years of active and reserve military service in the United States Marine Corps and has been determined permanently disabled through the Fire & Police Pension Association of Colorado (FPPA) and is a disabled Veteran of the United States Military.

2. The DFD has set a precedence of discriminatory and unlawful acts against Mr. Perez, which are deniably indisputable. Mr. Perez had filed an Equal Employment Opportunity Commission (EEOC) Denver Field office on in March of 2012 and then filed a Civil Complaint

1

(Civil Action No 15-CV-457-CBS David Perez Vs. Denver Fire Department and City and County of Denver) Pro Se in March of 2015 all within his legal rights while employed as a Firefighter for the DFD.  Because of those filings and his filing of discrimination with the Colorado Civil Rights Division in October of 2019, Mr. Perez had not only been subject to unlawfully retaliation actions and disparate treatment but was also discriminated against due to his disability caused by the gross negligent acts brought on by the DFD.  The DFD and the City then used Mr. Perez's disability against him to find Mr. Perez unfit for duty subjecting him to be placed on Leave Without Pay (LWOP) for his last 3 months employed with the City and be force to take an unwanted medical retirement.

## NATURE OF THE ACTION

3.     This employment action against the DFD and the City seeks to enforce rights and remedies guaranteed by, *inter alia*, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); by Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a; the Colorado Anti-Discrimination Act, as amended, Colo. Rev. Stat. § 24-34-402, *et seq.* ("CADA"); Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"); and by Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301–4335)  and to provide relief to Plaintiff, who has been adversely affected by DFD and the City's violation of such employment rights, as detailed below.

## PARTIES

4.     Plaintiff David Perez ("Mr. Perez") is currently, and at all times relevant to this suit, a resident of the State of Colorado.

5.     Defendant Denver Fire Department, headquartered in Denver Colorado, employs over 1000 paid firefighters and is a governed department under the City and County of Denver which

2

employs over 11,000 paid employees serving all those that visit, conduct business or resides in the

City of Denver Colorado.

<u>**JURISDICTION AND VENUE**</u>

6.    Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.

7.    Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a; the Colorado Anti-Discrimination Act, as amended, Colo. Rev. Stat. § 24-34-402, et seq.; Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq; and ("USERRA"), 38 U.S.C. §§ 4301–4335)

8.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. The Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367, as such claims raise out of the same case or controversy as Plaintiff federal law claims.

9.    Venue is proper in this District pursuant to 28 U.S.C. 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in the District of Colorado.

10.    On February 9, 2021, under the authority of 29 C.F.R. § 1601.28, the EEOC has issued Plaintiff a Dismissal and Notice of Right to Sue for his first complaint filed and on May 4, 2021 EEOC has issued Plaintiff a Dismissal and Notice of Right to Sue for his second complaint filed, authorizing this district court action.

11.    Based on the foregoing, Plaintiff has fulfilled all conditions precedent to initiation of this lawsuit.

<u>**FACTUAL ALLEGATIONS**</u>

12.    Mr. Perez is a highly decorated Veteran of the United States Armed Forces with an impeccable service record.  Prior to his employment and during a 5-year period during his

employment with the DFD, Mr. Perez served honorably in the United States Marine Corps with over 15 years of combined military service, serving over 10 years on active duty and over 5 years in the Marine Corps reserve.  During his service, Mr. Perez served three separate tours on active duty from June 1994 to June 1998, October 2001 to August 2005, and from October 2015 to December 2017. During his second tour on active duty, Mr. Perez served two combat deployments to Iraq during Operation Iraqi Freedom (OIF), which he was involved in combat operations during the initial invasion of Iraq in 2003 and again supporting U.S. effort in Iraq in 2004 based out of Camp Fallujah, Iraq.   Mr. Perez served in the Marine Corps Reserve from May 2013 to December 2017 during his employment with the DFD.

13.    After Mr. Perez was honorably discharged from the United States Marine Corps in 2005, Mr. Perez applied for and was hired for a fulltime paid position as a firefighter for the DFD. Mr. Perez met all requirements set forth by the City to become a full-time paid firefighter with the DFD to included but not limited to a written suitability assessment, a thorough background investigation, drug screening, and a medical evaluation to include a Psychological Evaluation.

14.    For over 13 years as a career firefighter with the City, from his date of hire on December 1, 2006 to his constructive discharge date at midnight on March 3, 2020, Mr. Perez dedicated his time both on and off duty in representing the DFD in an honorable manner.  Mr. Perez always held himself to a high standard and not once been reprimanded for any misconduct through official means but on the contrary had been recognized and praised by fellow firefighters and local affiliates to include the Colorado Rockies Baseball Organization in 2012 for his dedication to public service and recognized by local news channel Fox 31 in January, 2018 as Hero of the Month

15.    From his hiring date of December 1, 2006 up until February 2011, Mr. Perez continued to advance in his position of the DFD as a firefighter.  Mr. Perez had positive reviews from all of his supervisors and was considered an assist and dependable member of the DFD.  Mr. Perez

4

would volunteer his time and services to help causes that supported DFD back programs and organizations as well as helped organize fundraising events to include combined events that helped raise thousands of dollars for various causes to include family members of DFD firefighter, one of whom was diagnosed with cancer and another who's son was diagnosed with a life altering medical condition.

16.    In 2011, Mr. Perez was assigned to Fire Station 9 as a Technician supporting the DFD Hazardous Responsive Team.  On February 15, 2011, Mr. Perez would have a new supervisor assigned to his rig, Mr. Randy Wells.  At the time, Mr. Wells held the rank of Captain and has since been promoted to the rank of Chief.  Within days of working with Mr. Wells, Mr. Perez began to be singled out and subjected to discriminatory acts and disparate treatment and found himself working in a very hostile work environment.  There were several incidents where Mr. Perez was harassed with numerous unwarranted verbal reprimands, coaching and counseling's and indirect threats of being written up for his apparent misconduct and dereliction of duty.

17.    On May 22, 2011, Mr. Wells gave Mr. Perez an unwarranted coaching and counseling for Mr. Perez's apparent poor work ethic and conduct.  Without being present, Mr. Well's would later have an open discussion about Mr. Perez's work performance in front of Mr. Perez's peers.

18.    On May 25, 2011, Mr. Wells informed Mr. Perez that he was drafting up a letter of reprimand for Mr. Perez's apparent misconduct.  Mr. Perez informed the DFD Administration of the ongoing harassment and disparate treatment Mr. Perez was receiving from Mr. Wells.  The Administration Chief at the time, Tony Berumen informed Mr. Perez that if Mr. Perez did receive a letter of reprimand, to report it immediately to Administration.   The other shift officer, Lt. Robert Miller, told Mr. Perez the Mr. Wells was going to write him up but Lt. Miller intervened and talked Mr. Wells out of it.  This conduct by Mr. Wells was happening so frequently that the other members of Mr. Perez's crew started joking about how Mr. Perez needed to paint yellow footprints in the

5

office of Mr. Wells where Mr. Perez would stand while he was being counseled to ensure Mr. Perez held the same position each time he was called in.

19.     On August 17, 2011 Mr. and his Engine crew responded to call of an Auto vs Pedestrian accident.  Upon arrival, Mr. Perez and another paramedic came upon a young patient (around 2 years of age) who was hit and ran over by a truck.  The patient was determined Dead-On-Arrival (DOA) due to severe head trauma.   Mr. Perez was emotionally disturbed from this incident due to the fact the patient was close to the same age as his own son and the traumatic incident he just witnessed.

20.     Due to the severity of this incident, as outlined in DFD Critical Incident Stress Management Directive (CISM) which states that the DFD Dispatch should notify the department psychologist of several specific incidents, one of which includes the "*Death or severe injury to a child.*"  The DFD Dispatcher nor Mr. Perez's supervisor Mr. Wells took the necessary means to initiate this directive.

21.     After returning to the Firehouse around 1300 on August 17, 2011, monthly Emergency Medical Service (EMS) training was scheduled for that day.  This EMS training reviewed the use of field tourniquets and how to apply them on patients if needed.  This EMS training was conducted using pictures and stats that were taken from military combat operations from Iraq and Afghanistan during Operation Enduring Freedom, an environment that Mr. Perez had served two combat tours in.  Local, State and National Emergency Response Services use medical responses from United States Military combat operations as a training tool to train emergency responders.

22.     During the EMS training, Mr. Perez suffered a PTSD trigger where he began to think of his combat tours in Iraq.  Mr. Perez then felt he needed to remove myself from the training and quietly left the room. Mr. Perez when outside to get some fresh air.  Mr. Wells and had sought out Mr. Perez and noticed the change in demeanor of Mr. Perez.  Clearly seeing that Mr. Perez was

6

showing signs of emotional distress, Mr. Wells should have initiated the DFD CISM Directive at that time, which Mr. Wells never did.

23.    After returning to the firehouse from an odor investigation, Mr. Perez was approached again by Mr. Wells and accompanied by the Truck 9 officer Lieutenant Bob Miller in regards to Mr. Perez mental and emotional condition.  There was a concern regarding Mr. Perez's ability to perform his duties based off of the previous incidents that occurred earlier that day and the emotional response Mr. Perez displayed during EMS training.   Again, instead of initiating the Critical Incident Stress intervention protocols set forth by DFD policy and procedures, Mr. Wells made the decision to allow Mr. Perez to go home for the rest of the shift. This decision was made, not because Mr. Perez felt he could not perform his duties, but because other firefighters were concerned for Mr. Perez and Mr. Perez did not want this to be a distraction if Mr. Perez stayed at the firehouse and finished his shift.  Mr. Wells informed that this decision would stay in house and with in knowledge of the shift.

24.    Prior to Mr. Perez leaving for the remainder of his shift around 1500 on August 17, 2011, Mr. Perez spoke to his crew on Engine 9 along with the crew of Truck 9 with regards to the early events.   Mr. Perez spoke about the loss of his fellow Marines during his combat tours and how the combination of the day's events made him emotional and brought back those memories.  Mr. Perez wanted to let his fellow firefighters know what Mr. Perez deals with everyday regarding some of the events that took place during his military service and how the combination of the death of the boy earlier call and the EMS training had affected him.  Mr. Perez felt this was necessary because Mr. Perez wanted to ensure that his fellow firefighters knew this was an isolated incident and that there was no outlining concern with the ability for Mr. Perez to return to work and preform his duties. Because of the environment and the firefighter culture, a member is heavily favored or criticized by the reputation that a firefighter has, and so much of the knowledge a firefighter has.  Mr. Perez felt compelled to discuss his condition with his crew for those very reasons.  If Mr. Wells Wells had

7

initiated the DFD CISM Directive, Mr. Perez would not have ben placed in a position to need to explain the earlier actions in the manner in which he did.  However, with Mr. Wells allowing Mr. Perez to go home, this put him in a position to control future actions and decisions made against the mental health of Mr. Perez.

25.    On August 28, 2011, Mr. Wells wrote a letter stating that Mr. Perez be evaluated for PTSD, 11 days and 3 full shifts after the date of August 17, 2011 in which the letter referenced despite Mr. Perez continuing to perform his duties without question with any regards to his mental health, his abilities to perform his duties or safety concerns for his fellow firefighters or to the general public that he served.

26.    Despite not telling Mr. Perez that a letter requesting a mental evaluation was drafted and sent up the chain of command, Mr. Wells continued to subject Mr. Perez to a hostile work environment.  On September 10, 2011 Mr. Wells forced Mr. Perez and his fellow firefighters to take part in a hazing ritual only for the purposes of humiliating Mr. Perez and fostering friction between him and his coworkers. Mr. Wells forced Mr. Perez and his crew to engage in a bizarre "training" wherein they were directed to unload 1200 feet of fire hose from their fire engine onto a dark, poorly lit street in Denver, then break apart each 50-foot section, walk them back to the fire truck, reassemble the sections and put everything back on the fire truck. Mr. Wells made his true hazing intentions clear by telling Mr. Perez's peers "you can thank Perez" for the training, clearly trying to instigate the crew into resenting Mr. Perez and blaming him for the training exercise.

27.    There is nothing in the DFD training manual that outlines such training nor is this a common training practice in the fire service. The attempt by Mr. Wells to call this hazing ritual a "training" was merely pretext for an attempt to bully Mr. Perez in retaliation for imagined insubordination. Mr. Wells has displayed a history of bullying Mr. Perez and trying to encourage Mr. Perez's coworkers to disrespect him.

8

28.      After receiving the letter writing by Mr. Wells requesting a PTSD evaluation, Mr. Perez was contacted by the DFD administration and the DFD Administration Chief, Mr. Berumen set up a meeting for Mr. Perez to meet with the Department Psychologist, Karen Jackson for September 26, 2011, per the request from the DFD Administration and the City.  Mr. Berumen then informed Mr. Perez that the meeting with Karen Jackson was cancelled and that Mr. Perez needed to conduct a Fit-For-Duty evaluation through the office of Dr. Nicoletti.  Mr. Berumen informed Mr. Perez that the request for a Fit-for-Duty came from the Department Psychologist.  However, Mr. Beruman later stated in a deposition under oath that it was his own ultimate decision for Mr. Perez to undergo a Fit-for-Duty evaluation, and not that of the DFD Psychologist as previously mentioned.

29.      The office of Dr. Nicoletti and Associates did a Fit-For-Duty assessment on September 28, 2011 and September 29, 2011 with Mr. Perez.   Mr. Perez was determined "Fit for Duty with considerations" and was viewed as capable of working in a position that includes the responsibilities of a Firefighter with no restrictions.

30.      On October 1, 2011 Mr. Wells had organized a meeting with firefighters at Station 9 about Mr. Perez.  Mr. Perez was not scheduled to work that day and was not present for the meeting Captain Wells had with firefighters of Station 9.  The meeting was to discuss Mr. Perez having PTSD and get the opinion of other firefighters in regards to Mr. Perez having PTSD.  Mr. Wells also informed the firefighters that he submitted a letter with the request that Mr. Perez be evaluated for PTSD.

31.      At the request of Mr. Berumen, on October 24, 2011, Mr. Perez wrote a letter outlining the hostile work conditions that he worked under while Mr. Wells was his supervisors.  In addition, the Station 9 house captain wrote several letters to the DFD Administration outlining the unhealthy work conditions that Mr. Wells brought to that firehouse.   After submitting this to Mr. Berumen, Mr. Perez had hoped this would rectify the hostile work environment and disparate

treatment that Mr. Perez had received but it only magnified the situation continuing the discriminatory acts towards Mr. Perez.  The DFD Staff and Administration would continued to subject Mr. Perez to slandering and malice actions ultimately labeling Mr. Perez as an unstable employee suffering from PTSD.

32.    On July 20, 2012, Mr. Perez filed an EEOC complaint against the DFD for previous acts of discrimination stemming from my military service and stated medical condition of having PTSD from a work-related incident while on the DFD as well as my military combat deployments. Mr. Perez had brought numerous harassment and discrimination issues to the DFD administration and the City on multiple occasions with no resolve.  This EEOC filing, even thought it is the legal right of Mr. Perez, would have a detrimental affect towards him where Mr. Perez would continue to work in a hostile work environment, and continue to be subjected to disparate treatment, slandering statements, and continued work place harassment.

33.    In 2013, Mr. Perez was preparing to get issued active duty orders for a new Military Occupational Specialty (MOS) school for 5 months during the summer of 2013 due to his Military Reserve obligation with the Marine Corps Reserve.  On February 2013, Mr. Berumen wrote an internal Corresponding Letter falsely accusing Mr. Perez of making statements that exceptions should be made against DFD policy to benefit Mr. Perez and his service in the Marine Corps Reserve.  This letter was addressed to the upper DFD command staff in the attempt to discredit Mr. Perez and to continue to try and build a case against Mr. Perez to disqualify Mr. Perez of being a firefighter for conduct unbecoming.  When Mr. Perez responded to this letter and asked for details in what exceptions Mr. Perez apparently asked for, neither, Mr. Berumen nor the DFD gave any response to the matter.

34.    On October 5, 2016, Mr. Perez was harassed yet again while serving active duty military orders when Mr. Perez was told by his shift captain and DFD supervisor at the time, Captain

Derek Delgado, that his military responsibilities were causing staffing issues and creating obstacles against camaraderie-building within the firehouse. Mr. Delgado pressured an told Mr. Perez to transfer into an Administrative position solely because of his active duty service. When Mr. Perez brought this to the attention to then Administration Chief, now Chief of the DFD, Desmond Fulton, and then DFD Deputy Chief Todd Bower, Mr. Perez had requested an administrative transfer out of his duty assignment because he did not want to work under Mr. Delgado, which that request was denied.  This later lead to Mr. Perez returning to hostile work environment, falling under the command of the same officer that had harassed Mr. Perez into make a transfer in the first place.

35.     On November 1, 2016, Mr. Perez submitted a letter of intent to resign his position as a firefighter from the DFD. Mr. Perez submitted this letter to the DFD Administration Chief as well as a copy to the City's Manager of Safety. However because Mr. Perez was still on military orders and had no know dates of when his orders where ending, Mr. Perez could not seek other employment opportunities.

36.     39. On February 1, 2017, Mr. Perez submitted a letter to rescind his letter of intent to resign because of the potential hardship his resignation would bring to his family. Mr. Perez told the Administration Chief at that time that he was going to return to the DFD after he finished his military orders and Mr. Perez wanted to seek a position in the Arson Investigation Unit of the DFD. Mr. Perez was told that he would be notified of any openings if they become available which never happened. The DFD sought positions in Arson in August of 2017, and Mr. Perez was never notified of this opportunity.

37.     On March 13th, 2019, Mr. Perez sustained a debilitating Line of Duty ("LOD") injury to his right hand while performing his firefighter duties. While mitigating a house fire, Mr. Perez and his crew were conducting a primary search, as tasked to do. When they reached the back of the house, Mr. Perez found a wooden bed box spring wedged between the back door of the house and the

11

stairwell leading to the house's basement. Mr. Perez informed a crew outside, who were trying to force entry, that the box spring was in the way and was preventing the door from being opened. After a crewmember outside acknowledged Mr. Perez's warning, Mr. Perez proceeded to move the box spring out of the way so that they could gain entry. However, another crewmember outside failed to wait for Mr. Perez to safely move out of the way, and instead smashed the door with a 10-pound sledgehammer, crushing Mr. Perez's right hand between the door and the box spring.

38. On March 14th, 2019, Mr. Perez's hand was examined in an MRI by Dr. Christian Updike. The examination showed Mr. Perez suffered a full thickness partial tearing and large avulsion of the hand muscle and partial fracture to his sesamoid bone in his thumb. On March 18th, 2019, Dr. Sean M. Griggs, an Orthopedic Surgeon saw Mr. Perez and placed him in a cast. Dr. Christian Updike saw Mr. Perez again after his appointment with Dr. Griggs, approved him for modified duty, and wrote his work restrictions as "STRICT no lifting with R hand except paperwork due to torn thumb muscle. Must wear splint/brace." Administration Captain Gary Pierce informed Mr. Perez, that he needed to see a Denver Health Center for Occupational Safety and Health (COSH) doctor. On March 19th, 2019, Mr. Perez reported to the Denver Health COSH clinic where fell under the care of Dr. Jennifer Pula. Dr. Pula updated Mr. Perez's work restrictions and increased them, writing: "No use of right hand. No driving of company vehicle."

39. Mr. Perez was briefly assigned to the Administration Division on March 19th, 2019 before being assigned to the Operations Division on March 31st, 2019 in a modified duty position. Mr. Perez remained assigned to the Operations Division during this period until June 20th, 2019. While working for the Operations Division, Mr. Perez's assignments included conducting fire inspections assigned to firehouses in the downtown Denver area. Mr. Perez was instructed by then Administration Captain, Gary Pierce, that his inspections would be for Stations 1, 4, and 8. Mr. Perez was told by Mr. Pierce to report to Mr. Wells, who was assigned to the Operations Division.

12

40.    On April 3rd, 2019, Mr. Perez sent an email to Chief Wendi Moeder, Mr. Pierce, and Administration Lieutenant Jamie Markham, updating them about his upcoming medical appointments regarding his LOD injury. Mr. Perez also told them of his intention to first conduct and complete inspections for Station 1, and then continue doing inspections for Stations 4 and 8.

41.    On April 5th, 2019, Mr. Perez conducted inspections for Station 12 with the plan of continuing to complete inspections for Station 1. Mr. Perez received a phone call from Mr. Markham, inquiring about Mr. Perez's work status. Mr. Perez told Mr. Markham that he conducted inspections for Station 12 with the plan of continuing to complete inspections for Station 1. Mr. Markham called Mr. Perez again shortly afterward, instructing Mr. Perez to come to Mr. Markham's office on April 8th after Mr. Perez's scheduled doctor appointment regarding his LOD injury with Dr. Pula. Later that afternoon, Mr. Perez checked his email and realized Ms. Moeder had responded earlier to Mr. Perez's email sent on April 3rd, informing Mr. Perez that DFD Division Chief Charles Drennan would like him to focus on inspections for Stations 1, 4, and 8. Mr. Perez then emailed Ms. Moeder, informing him that he had completed inspections that day for Station 12, and that he intended continue inspections for Station 1 and follow up with Station 4 and Station 8 regarding their inspection needs the following week. Mr. Perez had intended to continue inspections for Station 1 that afternoon but the inspection tablet software key was lost when another crew member from Station 12 tried logging into the tablet needed to do Station 1's inspection and made that tablet unusable until it could be fixed by the City's tech support team.   At no point in time did Mr. Perez ever attempt to mislead his superiors or hide from his superiors that he conducted inspections for Station 12 in addition to his inspections for other DFD stations. Mr. Perez attempted in good faith to maximize his productivity and he kept his superiors informed as he performed his inspection duties.

42.    On April 8th, 2019, Mr. Perez reported to Mr. Markham's office after Mr. Perez's scheduled doctor appointment with Dr. Griggs. Mr. Perez's cast was removed at this doctor

appointment, but the doctor did not change Mr. Perez's work restrictions of "No use of right hand. No driving of company vehicle." Mr. Perez delivered to Mr. Markham a Hand Surgery Documentation form from Dr. Griggs, which showed no change in Mr. Perez's "No use of right hand. No driving of company vehicle" work restrictions.

43.    In spite of Mr. Perez's strict work restrictions, Mr. Markham commanded Mr. Perez to handwrite his work inspections on a paper log sheet due to Mr. Perez completing inspections for Station 12. The log sheet was intended to record each business in which Mr. Perez completed an inspection. The log sheet was created by Mr. Markham, printed on paper, and was intended for Mr. Perez complete by filling out each cell via handwritten notation. Mr. Markham put this log sheet in a clipboard so that it could be filled out via handwritten notation while inspecting business. Mr. Perez warned Mr. Markham that recording his inspections on this paper log sheet would be an unnecessary duplication of effort, given that Mr. Perez was already completing his inspections via the DFD's inspection software on a DFD-issued iPad device, which records all inspections with timestamps and tracks each inspection made by each individual inspector. DFD primarily uses this software for inspections and has done so for several years. Regardless, Mr. Markham still demanded that Mr. Perez complete the paper log sheet in addition to using the software. Mr. Perez suggested the possibility of taking a screenshot of the inspections on the iPad and emailing them to Mr. Markham, rather than completing the paper log sheet by filling out cells with handwritten notation. However, after examining the applications on the iPad, Mr.

44.    Mr. Perez is right-handed and cannot write by hand unless he uses his right hand. Mr. Perez was concerned that Mr. Markham's order would exacerbate his LOD injury, but he felt that he had no choice but to comply or else face a potential charge of insubordination from Mr. Markham, jeopardizing his career at DFD. Thus, Mr. Perez completed the paper log sheet by hand, as ordered

by Mr. Markham in spite of Mr. Perez's strict "No use of right hand. No driving of company vehicle" work restrictions. Completing the paper log sheet required more than 4 hours of writing by hand.

45.     On April 9th, 2019, Mr. Perez brought his concerns about exacerbating his LOD injury to Mr. Pierce due to being forced to follow Mr. Markham's order. In email correspondence with Mr. Perez on April 9th, 2019, Mr. Pierce acknowledged that "[t]he amount of writing that was required was excessive given the condition of [Mr. Perez's] hand." Mr. Pierce also commented that "I do not think the time and effort that it was going to take was understood by Lt. Markham."

46.     On April 11th, 2019, Mr. Markham admitted both to creating the paper log sheet himself and ordering Mr. Perez to complete the paper log sheet: "I developed a spread sheet that could be hand written [*sic*] to track his completed inspections . . . I instructed FF Perez to fill out the Mod Inspection Spreadsheet for businesses he would complete for the day." Mr. Markham tried to justify forcing Mr. Perez to complete the paper log sheet by hand by arguing, "I would consider writing as an essential aspect of paperwork therefore [Mr. Perez] was not asked to violate his work restriction." Mr. Markham's specific reference to "paperwork" is in reference to Mr. Perez's former work restriction from March 14th, 2019, wherein Dr. Updike wrote "STRICT no lifting with R hand except *paperwork* [emphasis added] due to torn thumb muscle." Mr. Pierce also referenced Mr. Perez's former work restriction in his email correspondence with Mr. Perez on April 9th, 2019: "Your restrictions on 03/19/19 stated 'STRICT no lifting with R hand except paperwork due to torn thumb muscle. Must wear splint/brace.'" In reality, Mr. Perez's work restrictions were updated and increased by Dr. Pula on March 19th, 2019 as "No use of right hand. No driving of company vehicle." Mr. Perez's work restrictions did not allow for paperwork or any other kind of work that required use of his right hand.

47.     On April 8th, 2019 (the day that Mr. Markham forced Mr. Perez to complete the paper log sheet via handwritten notation), Mr. Perez's work restrictions clearly stated that he could not use

his right hand. Mr. Markham was given proper notice of Mr. Perez's "No use of right hand. No driving of company vehicle" work restrictions because Mr. Perez personally delivered Dr. Pula's Hand Surgery Documentation to Mr. Markham that same day, immediately before Mr. Markham ordered Mr. Perez to complete the paper log sheet. Thus, Mr. Markham had no reasonable justification whatsoever for believing that Mr. Perez—a man whose cast was removed earlier that very morning—could safely complete the paper log sheet via handwritten notation as ordered. Furthermore, Mr. Markham had notice that recording inspections on the paper log sheet was redundant, given that the iPad's inspection software already recorded inspections with timestamps and tracked individual inspectors. Mr. Markham should have been familiar with the iPad's inspection software, given that it was commonly used by DFD for inspections for several years. Mr. Markham simply used his position as Mr. Perez's superior, with knowledge and direction by the DFD administration, to intimidate him into needlessly harming himself in retaliation for perceived disobedience when Mr. Perez did inspections for Station 12. Under the threat of possible insubordination charges and a detrimental blow to Mr. Perez's career at DFD, Mr. Perez was forced to obey an unreasonable, dangerous order that risked exacerbating an already devastating LOD injury.

48.     Mr. Perez diligently continued his work performing inspections, although he frequently experienced significant pain and discomfort from his LOD injury. On June 19th, 2019, Dr. Pula determined that any future treatment or physical therapy regarding Mr. Perez's LOD injury would be focused on pain management and rehabilitation. Dr. Pula also informed Mr. Perez that the pain and physical symptoms he was experiencing in his hand were now likely to be long-term and that his condition may never improve. Mr. Perez was put on full duty with no restrictions on June 20th, 2019 in order for him to see whether he could resume his full firefighter duties. However, the

16

pain and physical symptoms of his LOD injury did not subside over time, and on September 24th, 2019, Mr. Perez was in too much pain to complete his shift.

49.     On September 24th, 2019, Dr. Pula determined that Mr. Perez's LOD injury and pain symptoms were a safety concern and that he could no longer be in a safety sensitive position unless further evaluation determined otherwise. Dr. Pula placed Mr. Perez back on temporary work restrictions: "No use of right hand. Because of medication side effects, may have to leave work and return home if medication needed during work hours for pain. This may limit his total hours during the week."

50.     On October 17th, 2019, Dr. Pula determined that Mr. Perez's LOD injury had become permanent, updating his work restrictions to "limited use of right hand." Due to Mr. Markham's unreasonable, dangerous order and the failure of the DFD to make reasonable accommodations for Mr. Perez's LOD injury, Mr. Perez has permanently lost a significant amount of use in his dominant hand. This has substantially limited the quality of both his professional and personal life.

51.     Since Mr. Perez could no longer perform the physical labor necessary to work as a firefighter in safety sensitive positions, he sought out other positions within DFD where he could still contribute to protecting people's lives and property. In October of 2019, Mr. Perez was passed over for a position within the Arson/Fire Investigation Unit, despite being highly qualified and possessing adequate seniority. Mr. Perez had recently served a complaint to DFD filed through the Colorado Civil Rights Division for disability discrimination, failure to accommodate a disability, discrimination in terms and conditions of employment, discipline, and retaliation. Given that one of the candidates selected for the Arson/Fire Investigation Unit possessed less seniority and less training than Mr. Perez, DFD passed over Mr. Perez in retaliation for the Colorado Civil Rights Division complaint that he filed against them. Although DFD later claimed that Mr. Perez was not selected because he did not do a ride-along with a current arson investigator, this was never disclosed as a

17

requirement for the position. DFD simply used this as a pretext to pass over Mr. Perez and hire someone with less seniority and less experience.

52.    On October 21, 2019, Mr. Perez received notice from the Colorado Department of Labor and Employment's Division of Workers' Compensation that DFD was contesting Mr. Perez's workers' compensation claim. When stating their reasons for contesting the claim on the Notice of Contest, DFD stated "Further Investigation for MEDICAL RECORDS, OTHER INVESTIGATION." However, DFD did not request additional medical records from Mr. Perez until after Mr. Perez already received the Notice of Contest. Furthermore, DFD did not alter their decision to contest the claim even after Mr. Perez provided them with all requested medical documentation. Also, Mr. Perez's LOD injury has always been well documented, he has always kept DFD informed about the ongoing status of his LOD injury, and DFD had already acknowledged his LOD injury since March 31st, 2019 when they reassigned him to a modified duty position. Clearly there was no genuine issue of material fact between Mr. Perez and DFD regarding the existence of Mr. Perez's injury and that he had suffered the injury in the line of duty while performing his responsibilities as a firefighter. Contesting Mr. Perez's workers' compensation claim was simply a way for DFD to further retaliate against Mr. Perez and deny him the support to which he is entitled for his disability.

53.    On November 25th, 2019 Mr. Perez requested a meeting with Ms. Moeder which she informed Mr. Perez they would have but that meeting never took place.  It was at that time, that Mr. Perez filed paperwork with the FPPA for disability and also with City's Nationwide Short-Term disability agency.  Mr. Perez did so not knowing he was ineligible to receive short-term disability through Nationwide and that filing FPPA paperwork would lead to Mr. Perez's receiving a medical retirement and constructive discharge from the City.  This was information the DFD could have given Mr. Perez if the meeting requested by him would have been had.

18

54.     From September 25th, 2019 to February 14th, 2020, Mr. Perez was assigned to the Fire Prevention Bureau as a modified duty. During this time period from October 7th, 2019 to December 6th, 2019, Mr. Perez's assignment solely consisted of removing staples from voluminous amounts of forms and paperwork, typically spending more than 6 hours each workday repetitively removing staples. This staple-removing task was a part of a large ongoing project to convert hard copy files to electronic storage. The actual act of scanning or photocopying documents was performed by a volunteer civilian who came into perform those duties maybe once or twice each week. Mr. Perez never scanned or photocopied any documents, and he was never instructed to, or shown how to scan or photocopy documents.

55.     Mr. Perez was grossly overqualified for a position in which his sole responsibilities were to remove staples from papers, and he never made any requests to be transferred away from his previous assigned inspection position. Mr. Perez would have been capable of performing all essential functions of his inspection position within his work restrictions with reasonable accommodations. Furthermore, Mr. Perez made several requests during this time to be reassigned into support positions of which he would have been able to perform all essential functions of the positions, even within his work restrictions with reasonable accommodations. All of these requests were denied. Mr. Perez also requested several modified duty assignments that were more appropriate for Mr. Perez's qualifications and seniority, of which he could have performed all essential functions of the positions even within his work restrictions with reasonable accommodations. Mr. Perez was told by DFD administration that these assignments were "not available" to him. DFD then proceeded to grant these more desirable modified duty assignments to white men within DFD. It was commonly believed amongst the workforce at DFD that Mr. Perez's staple-removing assignment was intended to humiliate him, and many of Mr. Perez's colleagues made comments to him such as "looks like you

are in time out, who did you piss off?" and "you know, if you keep pulling staples, you are going to get carpal tunnel" and "man, you are getting paid well for slave labor."

56.     In addition to being overqualified for the staple-removing assignment, Mr. Perez's LOD injury also made the staple-removing assignment inappropriate from a health and wellbeing standpoint. Because of Mr. Perez's loss of full use of his dominant right hand, he was forced to pull staples using only his left hand. The repetitive motion of removing staples with a single, none dominant hand for more than 6 hours each day for multiple months caused Mr. Perez to develop an injury on his left hand. Mr. Perez reported his left hand's injury to an assigned Center for Occupational Safety & Health ("COSH") clinic doctor on December 5th, 2019. Unlike the permanent LOD injury on his right hand with "limited use of right hand" work restrictions, Mr. Perez's left hand injury was temporary, and he received a medical evaluation on December 19th, 2019 that removed the restrictions on his left hand. Likewise, Dr. Pula determined Mr. Perez's left hand was "back to full duty, no restrictions" on December 19, 2019.

57.     On November 13, 2019, Mr. Perez wrote a letter to the Department Chief, Eric Tade requesting Leave Without Pay for one day to make a medical appointment Mr. Perez had scheduled with the Veterans Administration.  Mr. Perez had exhausted all of his sick leave at that time which had been used for time off for his LOD hand injury.  Mr. Perez needed the day because the VA hospital was across town and Mr. Perez would more likely be gone for much of the day.  Not only was the request made by Mr. Perez denied, the DFD Administration did not advise him of other means to get the time off needed to this medical appointments or for future ones.  The DFD Administration has in the past allowed members to work alternate work schedules to make off-duty appointments that was not offered to Mr. Perez.  It was not until another officer working in Fire Prevention came to Mr. Perez and informed him he could request Family Medical Leave or for

donated sick time in efforts for Mr. Perez to get time off needed to make his off duty medical appointments.

58.     On December 6th, 2019, DFD administration placed Mr. Perez on LWOP due to his hand injuries acquired at work, and he remained on LWOP until he was constructively discharged at midnight on March 3rd, 2020. This caused enormous financial strain for Mr. Perez, who was the primary breadwinner of his household. DFD kept Mr. Perez on LWOP even after December 19th, 2019, when Mr. Perez's restrictions were removed on his left hand. DFD always had access to Mr. Perez's current work restriction status from the COSH clinic, so they had notice that Mr. Perez's work restrictions on his left hand were lifted. DFD also kept Mr. Perez on LWOP even after December 19, 2019, when Dr. Pula cleared Mr. Perez's left hand for "full duty, no restrictions."

59.     On January 8th, 2020, Mr. Moeder emailed Mr. Perez and told him "you have not been released to return to work with no restrictions, and your current restrictions do not allow you to perform the functions of your position as a firefighter." However, Mr. Perez's work restrictions for his left hand were already removed on December 19th, 2019, and Mr. Perez could use his right hand to perform support division duties in Fire Prevention or in Fire Dispatch. All updates to Mr. Perez's ongoing medical status were received, logged, and tracked by DFD administration.

60.     On January 21, 2020, being on LWOP nearly a month, Mr. Perez had no choice but to apply for public assistance through the Jefferson County Human Service office.  However, since Mr. Perez still showed he was employed with the City, Mr. Perez could not receive any financial or family assistance to offset the loss in pay.

61.     Dr. Pula continued to update the restrictions status for Mr. Perez and on February 4, 2020 Dr. Pula updated the work restrictions for Mr. Perez's right hand: "No Safety Sensitive position with right hand…no first responder positions"

62.     While on LWOP, Mr. Perez made several requests to DFD administration to return to work and to be reassigned to a support position wherein he could perform all essential functions of the position even within his LOD injury work restrictions with reasonable accommodations. He also requested a hardship transfer. All of these requests were denied by DFD, despite Mr. Perez no longer having any work restrictions on his left hand.  In November 2019, Mr. Perez had an informal interview with the officers at Fire Dispatch looking at a possible position transfer at that time.  A week after, Mr. Perez received a call from an assistant with the FPPA informing Mr. Perez that Mr. Pierce called the FPPA and informed them that Mr. Perez was seeking a position in Fire Dispatch. The representative with FPPA informed Mr. Perez that he cannot receive a FPPA disability pension and still hold a support position in the DFD at the same time.  Mr. Perez inquired if he can rescind his FPPA disability application and he was informed he could if the DFD moved Mr. Perez into a support division, an act that the DFD has done to many injured firefighters in the past and still has done to date.

63.     Given that the DFD continued to refuse to allow Mr. Perez to return to work despite him having no work restrictions on his left hand, and limited use of his right hand which would allow him to hold a position in several different support division, Mr. Perez believed in good faith that his only recourse would be to continue with the FPPA.  The FPPA instructed Mr. Perez that he would be unable to receive benefits while still employed with DFD, even though DFD was refusing to allow Mr. Perez to work and earn any pay. Caught between a rock and a hard place, Mr. Perez felt that he had no choice but continue with the FPPA for temporary medical disability retirement status with a 6-month re-evaluation. As such, Mr. Perez's employment with DFD was constructively terminated at midnight on March 3rd, 2020.

64.     On August 31, 2020, after 9 months of on-duty and 7 months of off-duty continuous therapy and treatment to Mr. Perez's right hand in an effort to return to full duty, the FPPA updated

22

Mr. Perez's disability status from Temporary Occupational Disability to a Permanent Occupational Disability. This disability status and Mr. Perez's ongoing LOD injury has prevented him from reenlisting into the Marine Corps Reserves, denying him the ability to continue his honorable military service as well as the ability to earn a military retirement. Mr. Perez's disability, both caused by and further worsened by DFD's negligence, is a disqualifying medical condition for enlistment as outlined under the Department of Defense, Medical Standards for Military Service.

## FIRST CLAIM FOR RELIEF
### (Discrimination and Harassment in Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*)

65.    Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.

66.    Plaintiff is an "employee" as that term is defined in 42 U.S.C. § 2000e(f).

67.    Defendant is an "employer" as that term is defined in 42 U.S.C. § 2000e(b).

68.    Title VII of the Civil Rights Act of 1962, as amended, 42 U.S.C. §§ 2000e *et seq.*, prohibits discrimination based on race and national origin.

69.    Based on the above-described acts, practices, and omissions, Defendant engaged in unlawful discrimination and harassment under Title VII based on Plaintiff's race  and national orgin (Hispanic).

70.    DFD and the City treated similarly situated city employees outside of Plaintiff's protected classification more favorably than Plaintiff. Among other things, Plaintiff was  harassed belittled, and criticized unjustifiably for his conduct; falsely accused of improper conduct; denied promotion; and disciplined without justification and/or subjected to heightened and/or disproportionate discipline. He was ultimately terminated without justification even though he was qualified and able

to perform duties in a support position. Defendant's conduct was sufficiently severe or pervasive that a reasonable person in Plaintiff's position would find his work environment to be hostile or abusive.

71.     Defendant knew or should have known of its management's conduct and failed to take prompt, remedial action to stop such conduct.

72.     As such, Defendant violated Title VII and discriminated against Plaintiff by not only subjecting him to sufficiently severe or pervasive harassment but also failed to act and condoned such harassment and subjected Plaintiff to less favorable terms and conditions of employment.

73.     DFD and the City acted intentionally, with malice, wantonly, and/or with conscious and/or reckless indifference to Plaintiff's rights.

74.     As a direct result of Defendant's conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is also entitled to and may seek any attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

**SECOND CLAIM FOR RELIEF**
**(Discrimination in Violation of Civil Rights Act of 1991, 42 U.S.C. § 1981a)**

75.     Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.

76.     As a Hispanic male, Plaintiff is a member of the classes protected by 42 U.S.C. § 1981. The statute prohibits against discrimination based on race.

77.     As referenced above, Plaintiff was subjected to less favorable terms and conditions of employment based on the fact that he is Hispanic, including but not limited to subjecting him to severe or pervasive harassment; condoning or tolerating such harassment and failing to protect Plaintiff after he reported the same; falsely accusing him of misconduct; denying him promotional

opportunities with pay increase; and disciplining Plaintiff without justification and/or subjecting him to heightened and/or disproportionate discipline. He was ultimately terminated without justification.

78.    The DFD and City acted intentionally, with malice and/or reckless indifference to Plaintiff's rights. As a direct result of Defendant's conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is also entitled to and may seek any attorney's fees and costs pursuant to 42 U.S.C. § 1981a(b).

**THIRD CLAIM FOR RELIEF**
**(Discrimination in Violation of CADA, Colo. Rev. Stat. § 24-34-402, *et seq.*)**

79.    Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.

80.    Defendant subjected Plaintiff to less favorable terms and conditions of employment based on his race and national origin, in violation of the CADA.

81.    The DFD and the City treated similarly situated comparators outside of Plaintiff's protected classification more favorably than Plaintiff. Among other things, Plaintiff was harassed, belittled, and criticized unjustifiably for his conduct; falsely accused of improper conduct; mocked because of his medical and mental condition; denying him promotional opportunities with pay increase; and disciplined without justification and/or subjected to heightened and/or disproportionate discipline. He was ultimately terminated without justification even though he was more than able to perform hi job responsibilities in a support position.

82.    The DFD and the City acted intentionally, with malice and/or reckless indifference to Plaintiff's rights.

83.    As a direct result of Defendant's conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is also entitled to and may seek any attorney's fees and costs as permitted by law.

**FOURTH CLAIM FOR RELIEF**
**(Retaliation in Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*)**

84.    Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.

85.    Title VII, 42 U.S.C. § 2000e-3(a), states in relevant part that "i[t] shall be unlawful employment practice for an employer … to discriminate against any individual … because [s]he has opposed any practice made an unlawful practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter."

86.    Plaintiff engaged in activity protected by Title VII on multiple occasions. Among other things, he opposed Defendant's unlawful and discriminatory practices under Title VII by submitting verbal and written statements regarding supervisorial misconduct to not only the DFD administration but also to the City's Human Resources office and EEO investigator.

87.    Plaintiff's opposition and complaints regarding Defendant's illegal practices were protected activities within the meaning of 42 U.S.C. § 2000e, *et seq.*

88.    As referenced above, Defendant unlawfully retaliated against Plaintiff by subjecting him to less favorable terms and conditions of employment and subjecting him to further harassment because she engaged in the above-described statutorily protected activities. Defendant's retaliatory conduct included but was not limited to harassing, belittling and criticizing Plaintiff unjustifiably;

26

falsely accusing Plaintiff of misconduct; denying him internship/shadowing opportunities; denying him an annual salary raise; disciplining Plaintiff without justification and/or imposing heightened and/or disproportionate discipline; and ultimately, terminating him.

89. A causal connection exists between Plaintiff's protected activities and Defendant's unlawful retaliation.

90. The DFD and City acted intentionally, with malice and/or reckless indifference to Plaintiff's rights.

91. As a direct result of Defendant's conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is also entitled to and may seek any attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

**FIFTH CLAIM FOR RELIEF**
**(Retaliation in Violation of the CADA, Colo. Rev. Stat. § 24-34-301, *et seq.*)**

92. Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.

93. Plaintiff participated in statutorily protected activity by opposing unlawful practices under the CADA, including discrimination and harassment based on Plaintiff's race and national origin.

94. As referenced above, Defendant unlawfully retaliated against Plaintiff by subjecting him to less favorable terms and conditions of employment and subjecting him to further harassment because she engaged in the above-described statutorily protected activities. Defendant's retaliatory conduct included but was not limited to harassing, belittling and criticizing Plaintiff unjustifiably; falsely accusing Plaintiff of misconduct; denying him promotional opportunities;; disciplining

Plaintiff without justification and/or imposing heightened and/or disproportionate discipline; and ultimately, terminating him.

95.     The DFD and the City acted intentionally, with malice and/or reckless indifference to Plaintiff's rights.

96.     As a direct result of Defendant's conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is also entitled to and may seek any attorney's fees and costs as permitted by law

**SIXTH CLAIM FOR RELIEF**
**(Failure to Accommodate in Violation of ADA, 42 U.S.C. §§ 12101 *et seq.*)**

97.     Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.

98.     The ADA requires an employer to provide reasonable accommodation to qualified individuals with disabilities who are employees or applicants for employment, unless to do so would cause undue hardship. U.S.C. §§ 12101 *et seq.* In general, an accommodation is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities. 29 C.F.R. pt. 1630 app. § 1630.2(o).

99.     Plaintiff suffers from work related PTSD, nerve damage, and carpal tunnel syndrome to his right hand.  As a result, Plaintiff is substantially limited in the major life activities and/or bodily functions of cardiovascular functionality and hand and arm motion. Plaintiff was therefore an "individual with a disability" within the meaning of 42 U.S.C. § 12111(8) of the ADA. Despite his disabilities, Plaintiff could, and did, perform the essential functions of his position with and without reasonable accommodation.

100.    In August 2019, Plaintiff informed the DFD that his injuries were more likely permanent from his LOD injury to his right hand. Instead of engaging in a conversation on what would be best for Mr. Perez and find work accommodations for his LOD injury, the DFD subjected Mr. Perez to the humiliating tasking of pulling staples, where Mr. Perez suffered another injury allowing the DFD to use that injury against him and place him on LWOP.  Also the DFD could have began the "interactive process" as required by the ADA, *see* 29 C.F.R. § 1630.2(o)(3), however the DFD took over five months to began the process which Mr. Perez was not given the 90 days to find an alternative work position before he was constructively discharged.

101.    From the time the Plaintiff was placed on LWOP up to the date of his discharge, Plaintiff requested the reasonable accommodation or request in change of duty assignments. Again, the DFD refused to engage in the "interactive process," instead placing the Plaintiff on LWOP. As a result, Plaintiff has not only suffered a life altering injury to his right hand, he endured a significant loss in income, health benefits and retirement options both with the DFD and his Military service.

102.    On information and belief, other members at the DFD were granted reasonable accommodation or change in duty assignments due to LOD or non-LOD injuries.

103.    Plaintiff's requests for accommodation and transfer to a support position were not only reasonable but also feasible without posing an undue hardship upon the DFD or the City.

104.    As a direct result of Defendant's conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is also entitled to and may seek any attorney's fees and costs as permitted by law.

**SEVENTH CLAIM FOR RELIEF**
**(Discrimination in Violation of ADA, 42 U.S.C. §§ 12101 *et seq.*)**

29

105.    Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.

106.    As referenced above, Defendant discriminated against Plaintiff on the basis of his disability by subjecting him to less favorable terms and conditions of employment and subjecting him to further harassment. Defendant's discriminatory conduct included but was not limited to falsely accusing Plaintiff of misconduct; denying him promotional opportunities; disciplining Plaintiff without justification and/or imposing heightened and/or disproportionate discipline; and ultimately, terminating him.

107.    As a direct result of Defendant's conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is also entitled to and may seek any attorney's fees and costs as permitted by law.

## EIGHTH CLAIM FOR RELIEF
### (Retaliation in Violation of ADA, 42 U.S.C. § 12203(a))

108.    Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.  The DFD denied Plaintiff the opportunity to transfer to a support division because he filed a complaint with the Colorado Civil Rights Division (CCRD), which are in his legal rights to do.  The City also denied the Plaintiff's Workers Compensation claim the same day the Plaintiff filed his claim with the CCRD without probable cause.

109.    As a direct result of Defendant's retaliatory conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of enjoyment of life,

embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is

also entitled to and may seek any attorney's fees and costs as permitted by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor

against Defendant and order the following relief as allowed by law:

A.     Compensatory damages, including but not limited to those for emotional

distress, inconvenience, mental anguish, and loss of enjoyment of life;

B.     Back pay and benefits;

C.     Front pay and benefits;

D.     Punitive damages;

E.     Attorneys' fees and costs of this action as permitted by law;

F.     Pre-judgment and post-judgment interest; and

G.     Such further relief as this Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff requests a trial by jury on all issues so triable.


Dated: May 7, 2021

_____
(Plaintiff's Original Signature)

*619 12th St #348.*
(Street Address)

*Golden Colorado, 80401*
(City, State, Zip)

*(303) 433-2702*
(Telephone Number)

31