**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No: 1:21-cv-01263-RMR

DAVID PEREZ

      Plaintiff,

v.

DENVER FIRE DEPARTMENT
CITY AND COUNTY OF DENVER

      Defendant,

_____

**SECOND AMENDED COMPLAINT AND JURY DEMAND**
_____

Plaintiff David Perez by and through counsel Christopher M.A. Lujan of EMPOWER P.C., respectfully alleges for his Second Amended Complaint and Jury Demand against the Denver Fire Department "DFD" and the City and County of Denver all referred to collectively herein as "the Defendants."

## INTRODUCTION

1.     Plaintiff was a dedicated firefighter with the DFD for 14 years who represented the department in an honorable manner. While serving as a firefighter with the DFD, Plaintiff was recognized on numerous occasions for his community service.

2.     Plaintiff is also a highly decorated veteran of the United States Marine Corps and has received numerous awards and citations which include: 1 Navy Marine Corps

Commendation Medal, 3 Navy Marine Corps Achievement Medals (1 with a Combat "V" for Valor), 1 Combat Action Ribbon, 1 Presidential Unit Citation, 2 Marine Corps Good Conduct Medals, 2 Iraqi Campaign Medals, 1 Global War On Terrorism Expeditionary Medal, 1 Outstanding Volunteer Service Medal, 3 Sea Service Deployment Ribbons, 1 Certificate of Commendation, 2 Letters of Appreciation, and 2 Meritorious Mast awards. during his first tour of duty.

3.      During his 15 years of active and reserve military service in the United States Marine Corps, Plaintiff served two separate tours on active duty from June 1994 to June 1998 and again from October 2001 to August 2005.  Plaintiff also served in the Marine Corps Reserves from May 2013 to December 2017 during his employment with DFD. During his second tour on active duty, Plaintiff served two combat deployments to Iraq during Operation Iraqi Freedom in 2003 and in Fallujah, Iraq in 2004.

4.      Plaintiff has been classified as permanently disabled through the Fire & Police Pension Association of Colorado (FPPA) and is a disabled Veteran of the United States Military.

5.      Plaintiff's hand was smashed between a door and wooden framed box spring when a firefighter from another crew tried to force entry to the home by striking a door with a sledgehammer.  This serious hand injury required months of doctor visits, therapy, and rehabilitation, which prevented him from serving his duties as a firefighter in a fire house.

6.      During his recovery, Plaintiff attempted to work conducting fire inspections of properties throughout downtown Denver.  While attempting to perform this work,

Plaintiff's immediate supervisor ordered Plaintiff to complete fire inspection paperwork by hand which exacerbated Plaintiff's hand injury. Plaintiff was ordered to complete this paperwork by hand despite the fact that DFD uses a computer program which allows inspectors to complete this task electronically.

7.      Plaintiff never recovered from his hand injury. Rather than working to provide Plaintiff with a reasonable accommodation for his disabilities, the Defendants then used Plaintiff's disability against him to find Plaintiff unfit for duty and forced him to take an unwanted medical retirement where he was separated from his job on 03 March 2020.

## NATURE OF THE ACTION

8.      This employment action against the DFD and the City seeks to enforce rights and remedies guaranteed by, *inter alia*, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"); Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq*. ("ADA"); and the Colorado Anti-Discrimination Act, as amended, Colo. Rev. Stat. § 24-34-402, *et seq*. ("CADA") and to provide relief to Plaintiff, who has been adversely affected by the Defendant's violation of such employment rights, as detailed below.

## ADMINISTRATIVE PREREQUISITES

9.      Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) and received a Notice of the Right to Sue letter from the EEOC on 04 May 2021.  Thus, all administrative prerequisites have been met.

## PARTIES

10.      Plaintiff David Perez (hereafter Plaintiff or "Plaintiff") is currently, and at all times relevant to this suit, a resident of the State of Colorado.

11.      Defendant Denver Fire Department, headquartered in Denver Colorado, employs over 1,000 paid firefighters, and is governed under the City and County of Denver which employs over 11,000 paid employees serving all those that visit, conduct business, or resides in the City of Denver Colorado.

## JURISDICTION AND VENUE

12.      Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.

13.      Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq.; and the Colorado Anti-Discrimination Act, as amended, Colo. Rev. Stat. § 24-34-402, et seq.

14.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. The Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 (a), as such claims raise out of the same case or controversy as Plaintiff's federal law claims.

15.     Venue is proper in this District pursuant to 28 U.S.C. 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in the District of Colorado.

16.     Based on the foregoing, Plaintiff has fulfilled all conditions precedent to initiation of this lawsuit.

## FACTUAL ALLEGATIONS

17.     Plaintiff is a highly decorated veteran of the United States Marine Corps with an impeccable service record and has received numerous awards and citations to include but not limited to, 1 Navy Marine Corps Commendation Medal, 3 Navy Marine Corps Achievement Medals (1 with a Combat "V" for Valor), 1 Combat Action Ribbon, 1 Presidential Unit Citation, 2 Marine Corps Good Conduct Medals, 2 Iraqi Campaign Medals, 1 Global War On Terrorism Expeditionary Medal, 1 Outstanding Volunteer Service Medal, 3 Sea Service Deployment Ribbon, 1 Certificate of Commendation, 2 Letters of Appreciation,  and 2 Meritorious Mast.

18.     During his fifteen-year career in the United States Marine Corps, Plaintiff served three separate tours on active duty from June 1994 to June 1998, October 2001 to August 2005, and from October 2015 to December 2017.  During his second tour on active duty, Plaintiff served two combat deployments to Iraq during Operation Iraqi Freedom (OIF), which he was involved in combat operations during the initial invasion of Iraq in 2003 and again supporting U.S. effort in Iraq in 2004 based out of Camp Fallujah, Iraq. Plaintiff served in the Marine Corps Reserve from May 2013 to December 2017 during his employment with the DFD.

19.     After Plaintiff was honorably discharged from the United States Marine Corps in 2005, Plaintiff applied for and was hired on 01 December 2006 for a fulltime paid position as a firefighter for the DFD.  Plaintiff passed all DFD's pre-employment tests including a written suitability assessment, a thorough background investigation, drug screening, and a medical evaluation which includes a psychological evaluation.

20.     For over 13 years as a career firefighter with the DFD, Plaintiff dedicated his time both on and off duty in representing the DFD in an honorable manner.  Plaintiff always held himself to a high standard and has never been reprimanded for any work performance issues or misconduct as outlined under the DFD Discipline Policy.

21.     Plaintiff has been recognized and praised by fellow firefighters and local organizations including the Colorado Rockies Baseball Organization in 2012 for his dedication to public service and was recognized by local news channel Fox 31 in January 2018 as "Hero of the Month."

22.     Plaintiff volunteered his time and services to help causes that supported DFD programs and organizations that helped raise thousands of dollars for various causes to include a family member of a DFD firefighter suffering from cancer and another family with a child diagnosed with a life altering medical condition.

23.     Plaintiff suffers from Post-Traumatic Stress Disorder (PTSD) that he developed while serving as a combat veteran in the United States Marine Corps.  Plaintiff was first diagnosed with PTSD in 2005 during a post combat deployment medical evaluation conducted through the V.A. when Plaintiff was Honorable discharged from the United States Marine Corps after his second tour of active-duty service.  The Plaintiff's

symptoms from his PTSD include headaches, fatigue, irritability, depression, apathy, and problems sleeping.

24.    On 13 March 2019, Plaintiff sustained a debilitating Line of Duty ("LOD") injury to his right hand while performing his firefighter duties. While fighting a house fire, Plaintiff and his crew were conducting a primary search of a residence and when they reached the back of the house, Plaintiff found a wooden bed box spring wedged between the back door of the house and the stairwell leading to the house's basement. Plaintiff informed a second crew that was outside the house who were also trying to force entry into the home.

25.    After a crewmember outside acknowledged Plaintiff's warning, Plaintiff proceeded to move the box spring out of the way so that the crew outside could gain entry. However, another crewmember outside failed to wait for Plaintiff to safely move out of the way, and instead stuck the door with a 10-pound sledgehammer, crushing Plaintiff's right hand between the door and the box spring.

26.    On 14 March 2019, Plaintiff's hand was examined in an MRI by Dr. Christian Updike. The examination showed Plaintiff suffered a full thickness partial tearing and large avulsion of the hand muscle and partial fracture to his sesamoid bone in his thumb.

27.    On 18 March 2019, Dr. Sean M. Griggs, an Orthopedic Surgeon saw Plaintiff and placed him in a cast.  Dr. Updike again saw Plaintiff and approved him for modified duty writing his restrictions as "STRICT no lifting with R hand except paperwork due to torn thumb muscle. Must wear splint/brace."

28.     Administration Captain Gary Pierce informed Plaintiff, that he needed to see a Denver Health Center for Occupational Safety and Health (COSH) doctor.  On 19 March 2019, Plaintiff was seen by Dr. Jennifer Pula.  Dr. Pula updated Plaintiff's work restrictions by writing, "No use of right hand. No driving of company vehicle."

29.     Plaintiff was briefly assigned to the Administration Division on 19 March 2019 before being assigned to a modified duty position in the Operations Division on 31 March 2019 where he would remain until 20 June 2019.  While working for the Operations Division, Plaintiff's assignments included conducting fire inspections assigned to firehouses in the downtown Denver area. Plaintiff was instructed by then Administration Captain, Gary Pierce, that his inspections would be for Stations 1, 4, and 8. Plaintiff was told by Capt. Pierce to report to Capt. Wells, who was assigned as the Special Operations Chief which fell under the Operations Division.

30.     On 03 April 2019, Plaintiff sent an email to Chief Wendi Moeder, Capt. Pierce, and Administration Lieutenant Jamie Markham, updating them about his upcoming medical appointments for treatment of his LOD injury. Plaintiff also told them of his intention complete inspections for Stations 1, 4, and 8.

31.     On 05 April 2019, Plaintiff conducted inspections for Station 12 with the plan of continuing to complete inspections for Station 1 later that afternoon.  The area Plaintiff was doing inspections for Station 1 had businesses that did not open until later that day due to an event scheduled to take place in the evening.  Plaintiff received a phone call from Lt. Markham, inquiring about Plaintiff's work status.  Plaintiff told Lt. Markham that he conducted inspections for Station 12 with the plan of continuing to complete

inspections for Station 1.  Lt. Markham called Plaintiff again shortly afterward, instructing Plaintiff to come to Mr. Markham's office on April 8th after Plaintiff's scheduled doctor appointment. Plaintiff asked Lt. Markham if he should report to his office at that time but Lt. Markham told Plaintiff no and that Plaintiff needed to report to Lt. Markham on 8 April 2019 as instructed.

32.     Later on the afternoon of 05 April 2019, Plaintiff checked his email and realized Chief Moeder had responded earlier to Plaintiff's email sent on 03 April 2019, informing him that DFD Division Chief Charles Drennan would like for him to continue inspections for Stations 1, 4, and 8. Plaintiff later emailed Chief Moeder, informing her that he had completed inspections that day for Station 12, and that he would continue inspections for Stations 1, 4 and 8 the following week.

33.     At no point in time did Plaintiff ever attempt to mislead his superiors or hide from his superiors that he conducted inspections for Station 12 in addition to his inspections for other DFD stations. Plaintiff attempted in good faith to maximize his productivity and he kept his superiors informed as he performed his inspection duties.

34.     On 08 April 2019, Plaintiff reported to Lt. Markham's office.  Plaintiff went to his scheduled doctor's appointment where Plaintiff had his cast removed. Although Plaintiff's cast was removed at his appointment, the doctor did not change Plaintiff's work restrictions of "No use of right hand. No driving of company vehicle." Plaintiff reported to Lt. Markham after his doctor's appointment as ordered and delivered to Lt. Markham a Hand Surgery Documentation form from Dr. Griggs, which showed no change in work restrictions.

35.     Despite Plaintiff's strict work restrictions, Lt. Markham commanded Plaintiff to handwrite all the inspections Plaintiff had completed to date on a paper log sheet created by Lt. Markham specifically for the Plaintiff.  The log sheet was intended to record each business Plaintiff inspected.  The log sheet was created by Lt. Markham while Plaintiff was at his doctor's appointment that morning, printed on paper, and was intended for Plaintiff to complete by filling out each category with his injured right hand. Lt. Markham put this log sheet on a clipboard so that it could be filled out via handwritten notation while inspecting businesses.

36.     Plaintiff advised Lt. Markham that recording his inspections on this paper log sheet would be an unnecessary duplication of effort, given that Plaintiff was already completing his inspections via the DFD's inspection software on a DFD-issued iPad device, which records all inspections with timestamps and tracks each inspection made by each individual inspector. DFD primarily uses this software for inspections and has done so for several years. Regardless, Lt. Markham still demanded that Plaintiff complete the paper log sheet in addition to using the software. Plaintiff suggested the possibility of taking a screenshot of the inspections on the iPad and emailing them to Lt. Markham, rather than completing the paper log sheet by filling out cells with handwritten notation. Plaintiff later realized that taking a screen shot of his inspections and emailing them was not possible and Plaintiff informed Lt. Markham of this.  Lt. Markham still disregarded the comments made by the Plaintiff' that the act of handwriting all of Plaintiff's inspections was redundant and Lt. Markham still pushed the order for Plaintiff to handwrite all of Plaintiffs completed inspection.

37.     Plaintiff is right-handed and cannot write unless he uses his right hand. Plaintiff was concerned that Lt. Markham's order would exacerbate his LOD injury, but he felt that he had no choice but to comply or else face a potential charge of insubordination from Lt. Markham, further jeopardizing his career at DFD. Thus, Plaintiff completed the paper log sheet by hand, as ordered by Lt. Markham despite Plaintiff's strict "No use of right hand. No driving of company vehicle" work restrictions. It took Plaintiff 4 hours of writing by hand to complete Lt. Markham's paper log sheet.

38.     On 09 April 2019, Plaintiff brought his concerns about exacerbating his LOD injury to Capt. Pierce due to being forced to follow Lt. Markham's order. In email correspondence with Plaintiff on 09 April 2019, Capt. Pierce acknowledged that "[t]he amount of writing that was required was excessive given the condition of [Plaintiff's] hand." Capt. Pierce also commented that "I do not think the time and effort that it was going to take was understood by Lt. Markham."

39.     On 11 April 2019, Lt. Markham admitted both to creating the paper log sheet himself and ordering Plaintiff to complete the paper log sheet in an email where he wrote: "I developed a spread sheet that could be hand written [*sic*] to track his completed inspections . . . I instructed FF Perez to fill out the Mod Inspection Spreadsheet for businesses he would complete for the day." Lt. Markham tried to justify forcing Plaintiff to complete the paper log sheet by hand by stating, "I would consider writing as an essential aspect of paperwork therefore [Plaintiff] was not asked to violate his work restriction." Lt. Markham's specific reference to "paperwork" is in reference to Plaintiff's

former work restriction from 14 March 2019, wherein Dr. Updike wrote "STRICT no lifting with R hand except *paperwork* [emphasis added] due to torn thumb muscle."

40.     Capt. Pierce also referenced Plaintiff's former work restriction in his email correspondence with Plaintiff on 09 April 2019 where he wrote: "Your restrictions on 03/19/19 stated 'STRICT no lifting with R hand except paperwork due to torn thumb muscle. Must wear splint/brace.'"

41.     Plaintiff's work restrictions were updated by Dr. Pula on 19 March 2019 as "No use of right hand. No driving of company vehicle." Plaintiff's work restrictions did not allow for paperwork or any other kind of work that required use of his right hand.  The DFD Administration, including, Lt. Markham has full access to any work restrictions that may have been sent by the Plaintiff's COSH doctor regarding the injury to the Plaintiff's right hand since the time Plaintiffs injury was first reported.

42.     On 08 April 2019 (the day that Lt Markham forced Plaintiff to complete the paper log sheet via handwritten notation), Plaintiff's work restrictions clearly stated that he could not use his right hand. Lt. Markham was given proper notice of Plaintiff's "No use of right hand. No driving of company vehicle" work restrictions because Plaintiff personally delivered Dr. Pula's Hand Surgery Documentation to Lt. Markham that same day, immediately before Mr. Markham ordered Plaintiff to complete the paper log sheet. Thus, Lt. Markham had no justification for believing that Plaintiff could safely complete the paper log sheet via handwritten notation as ordered.

43.     Furthermore, Lt. Markham had notice that recording inspections on the paper log sheet was redundant, given that DFD's inspection software already recorded

inspections with timestamps and tracked other individual inspectors. Lt. Markham should have been familiar with the iPad's inspection software, given that it was commonly used by DFD for inspections for several years. Lt. Markham simply used his position as Plaintiff's superior, with knowledge and direction by the DFD administration, to intimidate him into needlessly harming himself in retaliation for perceived disobedience when Plaintiff did inspections for Station 12. Under the threat of possible insubordination charges and a detrimental blow to Plaintiff's career at DFD, Plaintiff was forced to obey an unreasonable, dangerous order that risked exacerbating an already devastating LOD injury.

44.     Plaintiff diligently continued his work performing inspections, although he frequently experienced significant pain and discomfort from his LOD injury. On 19 June 2019, Dr. Pula determined that any future treatment or physical therapy regarding Plaintiff's LOD injury would be focused on pain management and rehabilitation. Dr. Pula also informed Plaintiff that the pain and physical symptoms he was experiencing in his hand were now likely to be long-term and that his condition may never improve.

45.     Plaintiff was put on full duty with no restrictions on 20 June 2019 in order for him to see whether he could resume his full firefighter duties. However, the pain and physical symptoms of his LOD injury did not subside over time, and on 24 September 2019, Plaintiff was in too much pain to complete his shift.

46.     On 24 September 2019, Dr. Pula determined that Plaintiff's LOD injury and pain symptoms were a safety concern and that he could no longer be in a safety sensitive position unless further evaluation determined otherwise. Dr. Pula placed Plaintiff back

on temporary work restrictions: "No use of right hand. Because of medication side effects, may have to leave work and return home if medication needed during work hours for pain. This may limit his total hours during the week."

47.     On 17 October 2019, Dr. Pula determined that Plaintiff's LOD injury had become permanent, updating his work restrictions to "limited use of right hand." Due to Lt. Markham's unreasonable, dangerous order and the failure of the DFD to make reasonable accommodations for Plaintiff's LOD injury, Plaintiff has permanently lost a significant amount of use in his dominant hand. This has substantially limited the quality of both his professional and personal life.

48.     Since Plaintiff could no longer perform the physical labor necessary to work as a firefighter in safety sensitive positions, he sought out other positions within DFD where he could still contribute to protecting people's lives and property.  In October 2019, Plaintiff was passed over for a position within the Arson/Fire Investigation Unit, despite being highly qualified and possessing adequate seniority.

49.     Plaintiff had recently served a complaint to DFD filed through the Colorado Civil Rights Division on 21 October 2019 for disability discrimination, failure to accommodate a disability, discrimination in terms and conditions of employment, discipline, and retaliation given that one of the candidates selected for the Arson/Fire Investigation Unit possessed less seniority and less training than Plaintiff.

50.     On 21 October 2019, Plaintiff received notice from the Colorado Department of Labor and Employment's Division of Workers' Compensation that the City was contesting Plaintiff's workers' compensation claim. When stating their reasons for

contesting the claim on the Notice of Contest, the City stated, "Further Investigation for MEDICAL RECORDS, OTHER INVESTIGATION." However, the City did not request additional medical records from Plaintiff until after Plaintiff already received the Notice of Contest. Furthermore, the City did not alter their decision to contest the claim even after Plaintiff provided them with all requested medical documentation. Plaintiff's LOD injury has always been well documented, he has always kept DFD informed about the ongoing status of his LOD injury, and DFD and the City had already acknowledged his LOD injury since 31 March 2019 when they reassigned him to a modified duty position.

51.     Contesting Plaintiff's workers' compensation claim was simply a way for Defendants to further retaliate against Plaintiff and deny him the support to which he is entitled for his disability.

52.     From 25 September 2019 to 14 February 2020, Plaintiff was assigned to the Fire Prevention Bureau on modified duty. Within that time from 07 October 2019 to 06 December 2019, Plaintiff's assignment solely consisted of removing staples from voluminous amounts of forms and paperwork, typically spending more than 6 hours each workday repetitively removing staples. This staple-removing task was a part of a large ongoing project to convert hard copy files to electronic storage.  The actual act of scanning or photocopying documents was performed by a volunteer civilian who came into perform those duties maybe once or twice each week. Plaintiff never scanned or photocopied any documents, and he was never instructed to, or shown how to scan or photocopy documents.

53.     Plaintiff was grossly overqualified for a position in which his sole responsibilities were to remove staples from papers, and he never made any requests to be transferred away from his previous assigned inspection position.  Plaintiff could perform all essential functions of his inspection position within his work restrictions with reasonable accommodations. Furthermore, Plaintiff made several requests during this time to be reassigned into support positions of which he would have been able to perform all essential functions of the positions, even within his work restrictions with reasonable accommodations.  All these requests were denied.

54.     Plaintiff also requested several modified duty assignments that were more appropriate for Plaintiff's qualifications and seniority, of which he could have performed all essential functions of the positions even within his work restrictions with reasonable accommodations. Plaintiff was told by DFD administration staff, Chief Moeder, Captain Pierce and Lt. Markham that these assignments were "not available" to him.

55.     DFD then proceeded to grant these more desirable modified duty assignments to Caucasian men within DFD.   It was commonly believed among the DFD workforce that Plaintiff's staple-removing assignment was intended to humiliate him, and many of Plaintiff's colleagues made comments to him such as "looks like you are in time out, who did you piss off?" and "you know, if you keep pulling staples, you are going to get carpal tunnel" and "man, you are getting paid well for slave labor."

56.     In addition to being overqualified for the staple-removing assignment, Plaintiff's LOD injury also made the staple-removing assignment inappropriate from a health and wellbeing standpoint. Because of Plaintiff's loss of full use of his dominant

right hand, he was now forced to pull staples using only his left hand. The repetitive motion of removing staples with a single, non-dominant hand for more than 6 hours each day for multiple months caused Plaintiff to develop an injury on his left hand. Plaintiff reported his left hand's injury to an assigned Center for Occupational Safety & Health ("COSH") clinic doctor on 05 December 2019. Unlike the permanent LOD injury on his right hand with "limited use of right hand" work restrictions, Plaintiff's left-hand injury was temporary, and he received a medical evaluation on 19 December 2019 that removed the restrictions on his left hand. Likewise, Dr. Pula determined Plaintiff's left hand was "back to full duty, no restrictions" on 19 December 2019.

57.    On 13 November 2019, Plaintiff wrote a letter to Chief Eric Tade requesting Leave Without Pay for one day to attend a medical appointment Plaintiff needed to schedule with the Veterans Administration for treatment of his combat related injuries. Plaintiff had exhausted all his sick leave at that time which had been used for time off for his LOD hand injury.  Plaintiff needed the day because the VA hospital was across town and Plaintiff would more likely be gone for much of the day.  Not only was the request made by Plaintiff denied, the DFD Administration did not advise him of other means to get the time off needed to attend this medical appointment or for future ones.

58.    The DFD Administration has in the past allowed members to work alternate work schedules to make off-duty appointments and this consideration was not offered to Plaintiff.  It was not until another officer working in Fire Prevention came to Plaintiff and informed him he could request Family Medical Leave or for donated sick time in efforts for Plaintiff to get time off needed to make his off duty medical appointments.  This was

an option the DFD Administration knew the Plaintiff could pursue but failed to offer this option to the Plaintiff or inform him that such option was available to him.

59.     On 06 December 2019, DFD administration placed Plaintiff on Leave With Out Pay (hereafter "LWOP") due to his hand injuries acquired at work, and he remained on LWOP until he was constructively discharged at midnight on 03 March 2020.

60.     Placing Plaintiff on LWOP caused enormous financial strain for Plaintiff, who was the primary breadwinner of his household.  DFD kept Plaintiff on LWOP even after 19 December 2019, when Plaintiff's restrictions were removed on his left hand.  DFD always had access to Plaintiff's current work restriction status from the COSH clinic, so they had notice that Plaintiff's work restrictions on his left hand were lifted. DFD also kept Plaintiff on LWOP even after 19 December 2019, when Dr. Pula cleared Plaintiff's left hand for "full duty, no restrictions."

61.     On 08 January 2020, Chief Moeder emailed Plaintiff, "you have not been released to return to work with no restrictions, and your current restrictions do not allow you to perform the functions of your position as a firefighter." However, Plaintiff's work restrictions for his left hand were already removed on 19 December 2019, and Plaintiff could use his right hand to perform support division duties in Fire Prevention or in Fire Dispatch. All updates to Plaintiff's ongoing medical status were received, logged, and tracked by DFD administration.

62.     Defendants failed to offer Plaintiff any opportunity to conduct any type of evaluation to determine what job functions he could function under his current work

restrictions or offer him any options to transfer to a support division as they have offered other firefighters in the past and who are still employed with department today.

63.     On 21 January 2020, after being on LWOP for nearly a month, Plaintiff had no choice but to apply for public assistance through the Jefferson County Human Service office.   However, since Plaintiff still showed he was employed with the Defendants, Plaintiff could not receive any financial or family assistance to offset the loss in pay.

64.     On 24 January 2020, the Defendants initiated the Interactive Process.

65.     Dr. Pula continued to update the restrictions status for Plaintiff and on 04 February 2020 Dr. Pula updated the work restrictions for Plaintiff's right hand: "No Safety Sensitive position with right hand…no first responder positions."

66.     While on LWOP, Plaintiff made several requests to DFD administration to return to work and to be reassigned to a support position wherein he could perform all essential functions of the position even within his LOD injury work restrictions with reasonable accommodations.   He also requested a hardship transfer.   A hardship transfer is a unwritten practice that injured firefighters can use to continue working while recovering from injury.   The injured firefighter makes a request for a trade with a firefighter who is in a support position which allows the injured firefighter to recover while the firehouse does not lose a member.   All of these requests were denied by DFD, despite Plaintiff no longer having any work restrictions on his left hand.

67.     This similar transfer request was requested by Plaintiff back in October 2011 when Plaintiff requested a transfer out of his assignment at Fire Station 9 to a support position in Fire Prevention due to a LOD PTSD incident.   The DFD asked a firefighter

assigned to Fire Prevention at that time if he would want to fill the duty spot of the Plaintiff in the firehouse to allow the Plaintiff to move to that Fire Prevention position.  The Fire Fighter in Fire Prevention position accepted the request and the Plaintiff was able to move to a position in Fire Prevention.

68.     In November 2019, Plaintiff had an informal interview with the officers at Fire Dispatch looking at a possible position transfer at that time.  A week after, Plaintiff received a call from an assistant with the FPPA informing Plaintiff that Capt. Pierce called the FPPA and informed them that Plaintiff was seeking a position in Fire Dispatch.  The representative with FPPA informed Plaintiff that he cannot receive a FPPA disability pension and still hold a support position in the DFD at the same time.  Plaintiff inquired if he could rescind his FPPA disability application and he was informed he could if the DFD moved Plaintiff into a support division, an act that the DFD has done to many injured firefighters in the past and still has done to date.

69.     Given that the DFD continued to refuse to allow Plaintiff to return to work despite him having no work restrictions on his left hand, and limited use of his right hand which would allow him to hold a position in several different support division, Plaintiff believed in good faith that his only recourse would be to continue with the FPPA Disability process.  The FPPA instructed Plaintiff that he would be unable to receive benefits while still employed with DFD, even though DFD was refusing to allow Plaintiff to work and earn any pay. Caught between a rock and a hard place, Plaintiff felt that he had no choice but to continue with the FPPA disability process for temporary medical disability retirement status with a 6-month re-evaluation.

70.     On 27 January 2020, Plaintiff contacted the Defendants' Human Resources Department regarding his medical condition and his multiple attempts to move into a support division within the DFD so that he could continue to serve with his work restrictions.  There are Caucasian members of the DFD with disabilities who were given reasonable accommodations by being afforded the opportunity to transfer into support positions and serve in the department.   The Plaintiff was not afforded a similar opportunity.

71.     In February 2020, a vacant position was made available in DFD's Fire Prevention Bureau.  This position required duties that Plaintiff could have performed under his current medical conditions and duties that he was familiar with and that he had performed in the past with the DFD.

72.     The Plaintiff was qualified to serve in the Fire Prevention Bureau and could perform these duties under his current medical condition.

73.     Without notification, DFD filled this position with another member of the department.   Under DFD policy and practice, members who transfer into a support position like the Fire Prevention Bureau are required to remain in that position for a minimum of 18 months.  The member who was selected for this position was soon transferred back to the firehouse after the Plaintiff was constructively terminated from the department a month later.

74.     As such, Plaintiff's employment with DFD was constructively terminated at midnight on 03 March 2020 which also ended the interactive process that the Plaintiff

was entitled to as outlined under the ADA.  The interactive process ended 50 days short of the 90-day reassignment period granted under the ADA.

75.     Had the Plaintiff been afforded the opportunity to work in the Fire Prevention Bureau in February 2020, he would not have been constructively discharged from the DFD one month later.

76.     On 31 August 2020, after 9 months of on-duty and 7 months of off-duty continuous therapy and treatment to Plaintiff's right hand in an effort to return to full duty, the FPPA updated Plaintiff's disability status from Temporary Occupational Disability to a Permanent Occupational Disability. This disability status and Plaintiff's ongoing LOD injury has prevented him from reenlisting into the Marine Corps Reserves, denying him the ability to continue his honorable military service as well as the ability to earn a military retirement. Plaintiff's disability was caused by and further worsened by DFD's actions.

77.     From the time the Plaintiff's COSH Doctor, Dr. Pula, deemed that the injury to his hand was permanent on  17 October 2019 through Plaintiffs constructive discharge at midnight on 03 March 2020, the DFD did not give Plaintiff any guidance, support or information on what to expect from this medical determination but only put the Plaintiff in a humiliating work setting only to later place Plaintiff on LWOP, causing a huge financial burden on the Plaintiff and his family up until his constructive discharge which those adverse effects are still felt today.

## FIRST CLAIM FOR RELIEF
### (Discrimination in Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*)

78.     Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.

79.     Plaintiff is an "employee" as that term is defined in 42 U.S.C. § 2000e(f).

80.     Defendant is an "employer" as that term is defined in 42 U.S.C. § 2000e(b).

81.     Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, prohibits discrimination based on race and national origin.

82.     Based on the above-described acts, practices, and omissions, Defendants engaged in unlawful discrimination and under Title VII based on Plaintiff's race and national origin (Hispanic).

83.     Defendants treated similarly situated city employees outside of Plaintiff's protected status more favorably than Plaintiff.  Plaintiff was denied the opportunity to transfer into several vacant positions which he could have successfully performed with his current medical restrictions.

84.     These opportunities included the opportunity to serve in DFD's Arson Investigation Unit and the Fire Prevention Bureau. Caucasian firefighters who have suffered workplace injuries have been given the opportunity to serve in support positions which allowed them to continue working in the department.  Plaintiff was denied this opportunity.

85.     Plaintiff was denied the opportunity to be placed in a temporary duty assignment that could accommodate Plaintiff's work restrictions while other Caucasian firefighters have been afforded this opportunity.

86.     Despite Plaintiff being told by DFD officials that vacant positions in its support departments were not available, the department did fill these positions with Caucasian employees who were less qualified than Mr. Perez.

87.     As such, Defendants violated Title VII and discriminated against Plaintiff by not only subjecting him to less favorable terms and conditions of employment.

88.     Defendants acted intentionally, with malice, wantonly, and/or with conscious and/or reckless indifference to Plaintiff's rights.

89.     As a direct result of Defendants' conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is also entitled to and may seek any attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

90.     As a proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer injuries, damages, and losses.

91.     The acts or omissions by the Defendants were the legal and proximate cause of Plaintiff's damages as may be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Discrimination in Violation of CADA, Colo. Rev. Stat. § 24-34-402, *et seq.*)

92.     Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.

93.     Defendants subjected Plaintiff to discriminatory or unfair employment practices based on his race and national origin, in violation of the Colorado Anti-Discrimination Act.

94.     The Defendants treated similarly situated comparators outside of Plaintiff's protected classification more favorably than Plaintiff.  Among other things, Plaintiff was denied the opportunity to transfer into DFD support positions which would have afforded him the opportunity to continue his career.

95.     These opportunities included the opportunity to serve in DFD's Arson Investigation Unit and the Fire Prevention Bureau. Caucasian firefighters who have suffered workplace injuries have been given the opportunity to serve in support positions which allowed them to continue working in the department.  Plaintiff was denied this opportunity.

96.     The DFD and the City acted intentionally, with malice and/or reckless indifference to Plaintiff's rights.

97.     As a direct result of Defendant's conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is also entitled to and may seek any attorney's fees and costs as permitted by law.

98.     As a proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer injuries, damages, and losses.

99.    The acts or omissions by the Defendants were the legal and proximate cause of Plaintiff's damages as may be proven at trial.

### THIRD CLAIM FOR RELIEF
### (Violation of Americans with Disabilities Act
### 42 U.S.C. §§ 12101 *et seq.*)

100.    Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.

101.    Plaintiff suffers from work related PTSD, nerve damage, and carpal tunnel syndrome to his right hand.

102.    From 2011 through 2020, Plaintiff made numerous DFD officials aware of each of his disabilities as listed above.  The Plaintiff has actual disabilities under the Americans with Disabilities Act.

103.    From 2011 through 2020, the Defendants are in possession of records which indicate that Plaintiff suffers from work related PTSD, nerve damage, and carpal tunnel syndrome to his right hand.  The Defendants have records of Plaintiff's disabilities as defined in the Americans with Disabilities Act.

104.    As a result of his disabilities, Plaintiff is substantially limited in the major life activities which include, but are not limited to, working, concentrating, performing manual tasks, lifting, thinking, communicating, and sleeping.

105.    Plaintiff is a "qualified individual with a disability" as defined in the Americans with Disabilities Act.

106.    Despite his disabilities, Plaintiff could, and did, perform the essential functions of his position with and without reasonable accommodation.

107.    From the time the Plaintiff was placed on LWOP up to the date of his discharge, Plaintiff requested the reasonable accommodation or request in change of duty assignments. Again, the DFD refused to provide a reasonable accommodation.  As a result, Plaintiff has not only suffered a life altering injury to his right hand, he endured a significant loss in income, health benefits and retirement options both with the DFD and his military service.

108.    On information and belief, other members at the DFD were granted reasonable accommodations or change in duty assignments due to LOD or non-LOD injuries.

109.    Plaintiff's requests for accommodation and transfer to a support position were not only reasonable but also feasible without posing an undue hardship upon the DFD or the City.

110.    As a direct result of Defendant's conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is also entitled to and may seek any attorney's fees and costs as permitted by law.

## FOURTH CLAIM FOR RELIEF
### (Retaliation in Violation of ADA, 42 U.S.C. § 12203(a))

111.    Plaintiff incorporates by reference the above paragraphs herein as though set forth in full.

112.    As authorized by DFD written policy, Plaintiff was temporarily reassigned to a modified duty on 28 March 2019 where he was required to perform fire inspections on downtown Denver businesses.

113.    Plaintiff's participation on DFD's modified duty program is a protected activity.

114.    DFD uses a computer program that allows for its' fire inspectors to electronically enter data into a system to quickly perform these inspections.

115.    On or around 09 April 2019, Lt. Markham forced Plaintiff to complete fire inspections manually by forcing him to annotate all previous inspections by hand. Despite knowing that Plaintiff was disabled and Plaintiff advising him that there have been no changes in his work restrictions, Lt. Markham still forced Plaintiff to handwrite the information from these inspections on pre-printed spreadsheets created by Lt. Markham.

116.    It took Plaintiff over four hours to complete this paperwork and Plaintiff, according to his doctor, further damaged his right hand.

117.    To his detriment, Plaintiff chose to follow Lt. Markham's orders rather than risk discipline for insubordination or workplace misconduct.

118.    Lt. Markham's orders constitute an adverse employment action which occurred less than two weeks after Plaintiff's decision to participate in a protected activity.

119.    Furthermore, and as referenced above, Plaintiff tried on numerous occasions from October 2019 through February 2020 to transfer into support positions which would have allowed for him to continue serving in the departments.

120.    On three different occasions, the Defendants denied Plaintiff the opportunity to transfer to the Arson Investigative Unit, the Fire Prevention Bureau, and as a "hardship transfer" in the department.  Each of these denials qualifies as an adverse employment action.

121.    In October 2011, Plaintiff requested a transfer out of his assignment at Fire Station 9 to a support position in Fire Prevention due to a LOD PTSD incident.  The DFD allowed this transfer request which had been originally initiated by the DFD at that time. This same type of transfer request was later denied to the Plaintiff on 23 January 2019, when the Plaintiff requested a hardship transfer to the Fire Prevention Bureau after the DFD placed the Plaintiff on LWOP.

122.    Each of these denials would dissuade a reasonable employee from participating in the DFD's modified duty programs which presumably is designed to allow firefighters hurt in the line of duty to maintain their employment.

123.    The numerous adverse employment actions suffered by the Plaintiff during this short period of time were caused because he is disabled and because he chose to participate in the department's modified duty programs.

124.    As a direct result of Defendants' retaliatory conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is also entitled to and may seek any attorney's fees and costs as permitted by law.

125.    Defendants' conduct was the proximate cause of Plaintiff's injuries, damages, and losses.

## FIFTH CLAIM FOR RELIEF
### (Disability Discrimination in Violation of the Colorado Anti-Discrimination Act C.R.S. § 24-34-402 *et.seq.*)

126.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

127.    Defendant is an employer who is properly subject to the provisions contained in the Colorado Anti-Discrimination Act.

128.    Defendants subjected Plaintiff to discriminatory or unfair employment practices based on his disabilities, in violation of the Colorado Anti-Discrimination Act.

129.    Plaintiff suffers from work related PTSD, nerve damage, and carpal tunnel syndrome to his right hand.

130.    From 2011 through 2020, Plaintiff made numerous DFD officials aware of each of his disabilities as listed above.  The Plaintiff has actual disabilities under the Colorado Anti-Discrimination Act.

131.    From 2011 through 2020, the Defendants are in possession of records which indicate that Plaintiff suffers from work related PTSD, nerve damage, and carpal tunnel syndrome to his right hand.

132.    The Defendants have records of Plaintiff's disabilities as defined in the Colorado Anti-Discrimination Act.

133.     As a result of his disabilities, Plaintiff is substantially limited in the major life activities which include, but are not limited to, working, concentrating, thinking, performing manual tasks, sleeping, lifting, and communicating.

134.     Plaintiff is a "qualified individual with a disability" as defined in the Colorado Anti-Discrimination Act.

135.     Despite his disabilities, Plaintiff could, and did, perform the essential functions of his position with and without reasonable accommodation.

136.     From the time the Plaintiff was placed on LWOP up to the date of his discharge, Plaintiff requested the reasonable accommodation or request in change of duty assignments. Again, the DFD refused to provide a reasonable accommodation.  As a result, Plaintiff has not only suffered a life altering injury to his right hand, he endured a significant loss in income, health benefits and retirement options both with the DFD and his military service.

137.     On information and belief, other members at the DFD were granted reasonable accommodations or change in duty assignments due to LOD or non-LOD injuries.

138.     Plaintiff's requests for accommodation and transfer to a support position were not only reasonable but also feasible without posing an undue hardship upon the DFD or the City.

139.     As a direct result of Defendant's conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of

enjoyment of life, embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is also entitled to and may seek any attorney's fees and costs as permitted by law.

### SIXTH CLAIM FOR RELIEF
### (Disability Retaliation in Violation of the
### Colorado Anti-Discrimination Act C.R.S. § 24-34-402 *et.seq.*)

140.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

141.    As authorized by DFD written policy, Plaintiff was temporarily reassigned to a modified duty on 28 March 2019 where he was required to perform fire inspections on downtown Denver businesses.

142.    Plaintiff's participation on DFD's modified duty program is a protected activity.

143.    DFD uses a computer program that allows for its' fire inspectors to electronically enter data into a system to quickly perform these inspections.

144.    On or around 09 April 2019, Lt. Markham forced Plaintiff to complete fire inspections manually by forcing him to annotate all previous inspections by hand. Despite knowing that Plaintiff was disabled and Plaintiff advising him that there have been no changes in his work restrictions, Lt. Markham still forced Plaintiff to handwrite the information from these inspections on pre-printed spreadsheets created by Lt. Markham.

145.    It took Plaintiff over four hours to complete this paperwork and Plaintiff, according to his doctor, further damaged his right hand.

146.    To his detriment, Plaintiff chose to follow Lt. Markham's orders rather than risk discipline for insubordination or workplace misconduct.

147.    Lt. Markham's orders constitute an adverse employment action which occurred less than two weeks after Plaintiff's decision to participate in a protected activity.

148.    Furthermore, and as referenced above, Plaintiff tried on numerous occasions from October 2019 through February 2020 to transfer into support positions which would have allowed for him to continue serving in the departments.

149.    On three different occasions, the Defendants denied Plaintiff the opportunity to transfer to the Arson Investigative Unit, the Fire Prevention Bureau, and as a "hardship transfer" in the department.  Each of these denials qualifies as an adverse employment action.

150.    In October 2011, Plaintiff requested a transfer out of his assignment at Fire Station 9 to a support position in Fire Prevention due to a LOD PTSD incident.  The DFD allowed this transfer request which had been originally initiated by the DFD at that time. This type of transfer was denied to the Plaintiff on 23 January 2019, when the Plaintiff requested a hardship transfer to the Fire Prevention Bureau after the DFD placed the Plaintiff on LWOP.

151.    Each of these denials would dissuade a reasonable employee from participating in the DFD's modified duty programs which presumably is designed to allow firefighters hurt in the line of duty to maintain their employment.

152.    The numerous adverse employment actions suffered by the Plaintiff during this short period of time were caused because he is disabled and because he chose to participate in the department's modified duty programs.

153.    As a direct result of Defendants' retaliatory conduct, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to back pay, front pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, embarrassment, other non-pecuniary losses, and other equitable and non-equitable losses. Plaintiff is also entitled to and may seek any attorney's fees and costs as permitted by law.

154.    Defendants' conduct was the proximate cause of Plaintiff's injuries, damages, and losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor against Defendant and order the following relief as allowed by law:

A.    Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

B.    Back pay and benefits;

C.    Front pay and benefits;

D.    Attorneys' fees and costs of this action as permitted by law;

E.    Pre-judgment and post-judgment interest; and

F.    Such further relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 23rd day of July 2021.

*s/ Christopher M.A. Lujan*
Christopher M.A. Lujan, Esq.
Empower P.C
2851 South Parker Road, Suite 316
Aurora, Colorado 80014
720.791.5700 (Office)
720.260.1802 (Mobile)
303.317.8145 (Facsimile)
christopher@empowerlawdenver.com
Attorney for Plaintiff
